## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

ALGORITHM, INC.
700 Stonehenge Parkway
Dublin, Ohio 43017,

ATTIVO GROUP, LLC
260 Peachtree Road, Suite 2200
Atlanta, Georgia 30303,

Case No. 2:18-cv-01394

BUSINESS COMPUTER TECHNOLOGIES, INC.
4960 South Gilbert Road, Suite 1-490
Chandler, Arizona 85249,

Judge

COPIOUS SOLUTIONS, LLC
101 Industrial Park Road, Suite 204
Taunton, Massachusetts 02780,

**JURY DEMAND ENDORSED HEREON**

DATASPRING, INC.
56 Parkway Commons Way
Greer, South Carolina 29650,

THE DONAS GROUP, INC.
3550 West Salt Creek Lane, Suite 110
Arlington Heights, Illinois 60005,

EXCEPTIONAL SOFTWARE SOLUTIONS LLC
17901 Monaghan Run
Bonita Springs, Florida 34135,

FANNIN CONSULTING, INC.
DBA QUEST – IV, INC.
7116 Summerfield Road
Temperance, Michigan 48144,

IPRO, INC.
401 South Wall Street, Suite 201
Calhoun, Georgia 30701,

MAYER, SHANZER & MAYER, P.C.
918 Maple Street
Conshohocken, Pennsylvania 19428,

RED DEER VENTURES, INC.
DBA RED DEER SYSTEMS
1835-A South Centre City Parkway, PMB 448
Escondido, California 92025,

SOFTWARE SOLUTIONS, INC.
10570 Justin Drive
Urbandale, Iowa 50322,

TRIANGLE PARTNERS, INC.
23890 Copper Hill Drive, Suite 159
Valencia, California 91354,

       Plaintiffs.

v.

ECI MACOLA/MAX, LLC
5455 Rings Road, Suite 100
Dublin, Ohio 43017,

       Defendant.

## PLAINTIFFS' VERIFIED COMPLAINT

Plaintiffs by and through their attorneys hereby allege as follows:

1.      This case arises from the unlawful and anticompetitive scheme of a software company—Defendant ECi Macola/MAX, LLC ("ECI")—to put its former distributor partners—Plaintiffs (the "Resellers")—out of business and create a monopoly for itself in markets created and sustained by the Resellers for twenty-five years.

2.      ECI is the most recent in a long line of owners of a business software platform called Macola. For decades, ECI and its predecessors have relied on the Resellers not only to sell Macola to end users (the "End Users"), but also to provide a wide array of support and consulting services necessary to successfully integrate the software into End Users' business operations.

2

3.     In creating a market for Macola and assisting End Users with implementing the software, the Resellers have developed expertise regarding Macola.  They have acquired a deep understanding of Macola's design, born of a long acquaintance with the software and a familiarity with its historical development to meet new needs and technological innovations.

4.     The Resellers have also cultivated expertise in helping End Users tailor Macola to their needs and integrate it into their businesses ("Consulting"), and in providing daily helpdesk service ("Support").  These services involve not only product knowledge, but also understanding the needs of Macola's core users—small- and medium-sized businesses, particularly those engaged in manufacturing.

5.     In meeting End Users' unique needs, the Resellers have developed a wide array of custom programs, applications, forms, reports, code, workarounds, documentation, and procedures (the "Reseller Technology").  The Reseller Technology remains embedded in hundreds if not thousands of End Users' business systems, often inextricably linked with and critical to the functioning of Macola.

6.     ECI and its predecessors, meanwhile, have largely been content to leave these sales, Support, and Consulting services to the Resellers.  The relationship between ECI and the Resellers is governed by a Reseller Agreement.[1]

---

[1] Each Reseller has signed a separate Reseller Agreement with ECI, and, in general, the Reseller Agreements largely do not differ substantively from one another on the issues relevant here. This Verified Complaint therefore refers to them collectively as the "Reseller Agreement." Nevertheless, the Reseller Agreements have been executed at different times and so there are essentially four versions  of the Reseller Agreement involved here.  Exhibit A includes all of the "Version 1" Reseller Agreements, Exhibit B includes "Version 2" agreements, Exhibit C includes "Version 3" agreements, and Exhibit D includes "Version 4" agreements.  Exhibit E is a summary table showing which version of the Reseller Agreement each Reseller has executed.  In this Verified Complaint, where there are discrepancies among the agreements, either substantively or in wording or section numbering, that fact is reflected in the citations.

7.     Now, ECI has decided to sever its relationship with the Resellers and sell Macola directly to End Users.  But rather than compete for the End Users' Support and Consulting business, ECI has resorted to unlawful, anticompetitive tactics, breaching its contracts with the Resellers, tortiously interfering with End Users' and Resellers' relationships, and violating state and federal antitrust law.

8.     ECI's misinformation and misconduct, which have already caused the Resellers economic losses, threaten irreparable harm to the Resellers, permanently damaging their good will and threatening to put them out of business.

9.     Through this litigation, the Resellers seek the following relief:  *first*, recovery of the damages caused by ECI's breaches of contract, tortious interference, unfair competition, and antitrust violations; *second*, a declaratory judgment stating that after termination of the Reseller Agreement, (a) the Resellers and End Users are free to continue to do business together, (b) ECI's obligation to pay commissions to the Resellers under the Reseller Agreement survives, and (c) ECI is prohibited from using, adopting, or incorporating the Reseller Technology; and *third*, a temporary restraining order and preliminary and permanent injunctions (a) prohibiting ECI from further wrongful interference in the contractual and ongoing business relationships between the Resellers and End Users, (b) prohibiting ECI from carrying out its unlawful tying arrangement, (c) prohibiting ECI from further attempts to monopolize the markets for Support and Consulting, (d) requiring ECI to continue commission payments to the Resellers under the Reseller Agreement, and (e) prohibiting ECI from further ██████████████████████ ████████ .

## **PARTIES**

10.     Plaintiff Algorithm, Inc. is an Ohio for-profit corporation with its principal place of business in Ohio.

11. Plaintiff Attivo Group, LLC is a Delaware limited liability company whose members are citizens of Georgia.

12. Plaintiff Business Computer Technologies, Inc. is an Arizona for-profit corporation with its principal place of business in Arizona.

13. Plaintiff Copious Solutions, LLC is a Massachusetts limited liability company whose sole member is a citizen of Massachusetts.

14. Plaintiff DataSpring, Inc. is a South Carolina for-profit corporation with its principal place of business in South Carolina.

15. Plaintiff The Donas Group, Inc. is an Illinois for-profit corporation with its principal place of business in Illinois.

16. Plaintiff Exceptional Software Solutions LLC is a Florida limited liability company whose sole member is a citizen of Florida.

17. Plaintiff Fannin Consulting, Inc. is a Michigan for-profit corporation with its principal place of business in Michigan.

18. Plaintiff iPro, Inc. is a Georgia for-profit corporation with its principal place of business in Georgia.

19. Plaintiff Mayer, Shanzer & Mayer, P.C. is a Pennsylvania professional corporation with its principal place of business in Pennsylvania.

20. Plaintiff Red Deer Ventures, Inc. is a California for-profit corporation with its principal place of business in California.

21. Plaintiff Software Solutions, Inc. is an Iowa for-profit corporation with its principal place of business in Iowa.

22.     Plaintiff Triangle Partners, Inc. is a California for-profit corporation with its principal place of business in California.

23.     Defendant ECI is a Delaware limited liability company whose sole member, ECi Software Solutions, Inc., is a Delaware corporation with its principal place of business in Texas. ECI was formerly known as Exact Software North America, LLC ("Exact").

## JURISDICTION AND VENUE

24.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it involves claims arising under federal law, specifically 15 U.S.C. §§ 1 & 2.

25.     This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy between each Reseller and ECI exceeds $75,000.  Complete diversity exists among the parties because Defendant ECI is a citizen of Texas and Delaware and none of the Plaintiffs is a citizen of Texas or Delaware.

26.     This Court has personal jurisdiction over Defendant ECI because it transacts business in Ohio and has submitted to the Court's jurisdiction under the Reseller Agreement. (Exs. A & B, § 12.8; Exs. C & D, § 12.7).

27.     Under the Reseller Agreement, the parties agree that venue is proper only in "the state or federal courts for Franklin County, Ohio."  (*Id.*).  Moreover, venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant ECI resides in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

### The Resellers develop a market for Macola.

28.     Macola is generally referred to as enterprise resource planning ("ERP") software, meaning that it is a single system integrating multiple modules, each of which controls some

portion of a business's operations.  For example, Macola can perform many common business functions such as customer-relationship management, accounting, and billing, and also many specialty functions such as project management and quality control of manufacturing processes.

29.     A variety of third-party software integrates with Macola.  ECI sells some of this third-party software, largely through the Resellers, and several of the Resellers also independently sell other third-party software.

30.     Because Macola performs so many critical business functions, it must be carefully integrated into each End User's unique business operations.  In many cases Macola must be extensively modified for End Users and incorporated with and/or enhanced by third-party software and custom modifications.

31.     The process of preparing for a Macola "go live" date often involves months of planning, testing, and training, and even End Users with large IT departments frequently rely on the Resellers for assistance with the process.

32.     Many End Users require the assistance of professional consultants such as the Resellers to assist with the process of installing, integrating, and configuring Macola.  In this capacity, Resellers work with End Users to understand how their businesses work and then implement Macola in the most effective and efficient way possible.  Many of these Reseller services are largely independent of Macola and relate to business best practices such as improving inventory-record accuracy or offering payment terms that reduce days receivables outstanding.  These services are collectively referred to herein as "Consulting."

33.     Aside from Consulting, End Users also frequently purchase from the Resellers a helpdesk service, allowing End Users to call the Reseller when they have questions relating to Macola.  These services are referred to herein as "Support."

34. Finally, End Users generally purchase a maintenance plan, which consists principally of ongoing Macola software updates, patches, and error corrections. This service is referred to hereinafter as "Maintenance."

35. When an End User purchases Macola, it enters into a standard license agreement with ECI (the "License Agreement"). ECI also requires End Users to sign new license agreements when certain other events occur.

36. Under the License Agreement, ECI requires End Users to pay for Maintenance with their initial purchase of Macola. The Reseller Agreement ███████████████████████ ███████████████████████████. (Exs. A–D, § 5.1). When an End User purchases Macola from a Reseller, ECI ███████████████████████████████ ███████████████████████████████████████████." (*Id.*). Maintenance automatically renews annually, and Resellers ███████████████████████ ███████████████████████████. This commission arrangement reflects the parties' understanding that margin back commissions allow the Reseller to recoup their extensive investment in the Macola sales process.

37. Each End User is registered in ECI's customer database as a customer of one of the Resellers or as an ECI "Direct" customer. █████████████████████████████ █████████████████████████████████ █████████████████████████████████ █████████████████████████████████ ███████████████████, (Exs. C & D, § 4.2(e)).

**ECI begins competing with the Resellers, committing multiple
breaches of the Reseller Agreement.**

38.     In late 2017, soon after ECI was acquired by ECi Software Solutions, Inc., ECI

began to reveal a new corporate strategy of trying to take Support and Consulting business—

along with its revenue stream—from the Resellers through predatory offers of software

discounts.  On one such occasion, a potential end user was interested in purchasing Macola and

related Support services through Plaintiff Algorithm.  ECI offered the customer a deep discount

on the software—but only if the customer purchased Support from ECI rather than from

Algorithm.  The potential end user walked away in frustration and disgust with ECI's strong-arm

conduct.

39.     In recent months, ECI's anticompetitive tactics and campaign of misinformation

have only become more overt, resulting in multiple breaches of the Reseller Agreement.

40.     On September 13, 2018, ECI conducted a webinar for End Users announcing that

it was now offering a new discounted Enterprise License Agreement ("ELA") program.  An ELA

is one of the ways End Users can elect to pay to license Macola.  In contrast to traditional per-

user license-fee arrangements, ELAs provide larger companies the ability to change the number

of users over time while maintaining fixed, predictable pricing.  Through the webinar, ECI also

offered End Users participating in the ELA program free Consulting.

41.     ECI refused to extend the discounted ELA program to the Resellers.

42.     ECI's exclusive webinar offerings violate the Reseller Agreement in two ways.

43.     First, under the Reseller Agreement, ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████."  (Exs. A–D, § 4.2(f)

9

(emphasis added)).  By ████████████████████████████████████████, ECI

violated section 4.2(f) of the Reseller Agreement.

44.     Second, ECI's webinar offer also violates the Reseller Agreement by ███████

████████████████.  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████."  (*See* Exs. C & D, § 4.2(e)).  ████████████████

████████████████████.

45.     There have been additional breaches as well.

46.     In direct violation of the Reseller Agreement, ECI has ████████████████

████████████████████████████████.  (Exs. A & B, at Ex. E;

Exs. C & D, at Ex. IV).

47.     Also in direct violation of the Reseller Agreement, ECI has ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████."  (Exs. C & D,

§ 12.13).  In October 2018, ECI ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████.  The email states that ECI is looking for

"resources who currently have expertise in [ECI products] and may also have interest in

broadening their expertise."  "If becoming an ECi Independent Contractor is of interest to

you," the email says, "please email me back to arrange a time to discuss."

**ECI gives notice of termination to Resellers and threatens
multiple additional breaches of the Reseller Agreement.**

48.     On October 1, 2018, ECI sent the Resellers a letter stating that ECI intended to

terminate the Reseller Agreement effective December 31, 2018 (the "Termination Letter," a

representative copy of which is attached as Exhibit F).

49.     The Termination Letter could hardly be more explicit in its intention to quash

competition and terminate the Resellers' business relationships:

> *any agreements between [Reseller] and any customers* regarding
> the provision of support services by [Reseller] *should be
> discontinued* as of the effective date of termination of the
> Agreement, as [Reseller] will no longer be authorized to support
> ECI Licensed Products or invoice end users for Enterprise Support
> Services.     [Reseller] will also cease to be an authorized
> professional services provider upon termination of the Agreement,
> and will *not be permitted to access or perform services on any
> ECI Licensed Products*.

(Ex. F at 2 (emphases added)).  For good reason, ECI provided no citation to the Reseller

Agreement for this proposition.

50.     Moreover, the Termination Letter states ECI's intention to stop paying the

Resellers ongoing margin back commissions for business they have brought in.  According to

ECI, upon termination the Resellers "will cease being eligible for margin back payments for

maintenance and support contracts where ECI billed an end user for Enterprise Support

renewals." (*Id.*).  Again, ECI could find nothing in the Reseller Agreement to support this threat.

51.     In fact, the Reseller Agreement places no impediment on the Resellers' ability to

provide ongoing Support and Consulting to End Users, and it obligates ECI to ███████████

████████████████████████████ after termination of the Reseller Agreement.

**ECI fraudulently misrepresents to End Users that they can no
longer work with the Resellers.**

52. Also on October 1, 2018, ECI sent End Users a letter (the "End User Letter," a representative copy of which is attached as Exhibit G).

53. The End User Letter fraudulently states that under the License Agreement the Resellers will no longer be able to provide "support services for the Macola software products, or perform consulting services for Macola software products that are directly licensed to you [i.e., the End User]." (*Id.*). Similarly, the End User Letter states, "After December 31, 2018 your Solution Provider [i.e., Reseller] will no longer be able to offer support or consulting services for Macola products." (*Id.*).

54. The End User Letter then informs the End User that ECI is its only choice for ***any*** services related to Macola: "All future licensing transactions will be directly with ECi and professional services for ECi products may only be performed by ECi and its authorized services providers, which may include independent contractors with Macola product expertise from a variety of sources, including former Solution Providers." (*Id.*).

55. After sending the End User Letter, ECI has held several webinars for End Users in which it has repeated its fraudulent claims that End Users are prohibited by the License Agreement from giving Resellers access to the Macola software, and thus are prohibited from receiving Support or Consulting from anyone other than ECI.

56. In fact, as ECI knows, the License Agreement says no such thing. Rather, it specifically ***permits*** End Users to hire consultants such as the Resellers to assist with Macola software: "[End User] further agrees that it shall not make any disclosure of any or all Proprietary Information [including Macola] to anyone, ***except to employees and contractors of [End User]*** to whom such disclosure is necessary to the use for which rights are granted

12

hereunder, provided that any such consultants first agree in writing to be bound by the provisions of Sections 4 and 6 of this Agreement."

57.     ECI knows full well that its claims regarding the License Agreement are illegitimate.  Indeed, since announcing the planned termination, ECI has begun trying to force new, more-restrictive license agreements on End Users that actually do prevent them from working with third parties such as the Resellers in the future.  For example, in the new agreements, ECI has **_removed_** the language quoted above that permits "contractors" such as the Resellers to access Macola.

**ECI violates state and federal antitrust laws through unlawful tying and attempted monopolization.**

58.     The End User and Termination Letters represent ECI's first steps in a deeply anticompetitive scheme that violates state and federal antitrust law.

59.     ECI's endgame—about which it has been crystal clear—is to destroy all competition in the markets for Support and Consulting and use its monopoly power to extract above-market prices from captive End Users.

60.     As ECI knows well, End Users who have already adopted Macola cannot turn to a competitive ERP product without sustaining extremely high switching costs.

61.     Moreover, ECI already has a monopoly on the market for Maintenance—no other provider offers Maintenance for Macola.

62.     Purchasing Maintenance is necessary for an End User to receive the full value of Macola over time, as bugs or other errors are discovered and improvements are developed. Indeed, End Users who forgo Maintenance and no longer have access to software patches can find that their Macola software is no longer compatible with new versions of the underlying

Microsoft operating system.  For these reasons, a large proportion of End Users purchases Maintenance.

63.     Recognizing the vulnerability of its captive End Users, ECI is requiring End Users who wish to purchase Maintenance to purchase Support as well (a service that was previously optional)—whether they want it or not.

64.     This arrangement—conditioning Maintenance on buying Support from ECI—exploits the End Users' inability to switch to a competitor.

65.     The arrangement effectively doubles the cost of Maintenance and destroys competition in the Support market.

66.     Moreover, ECI's misrepresentations regarding the terms of the License Agreement and the Reseller Agreement represent a separate attempt to monopolize the markets for Support and Consulting by preventing competition from the Resellers in those markets.

67.     Some Resellers are harmed not only by being excluded from competing, but also because they are End Users themselves and use Macola for their own internal business purposes.

68.     Taken all together, ECI's cynical strategy is clear.  To capture a larger share of the business that the Resellers have built up over twenty-five years, ECI is attempting through fraud and coercion to prevent Resellers and End Users from doing business together.  Once the Resellers are crippled and End Users have nowhere else to turn, ECI can hire displaced Reseller employees as cheap independent contractors and demand high profits from captive End Users.

## COUNT ONE

### Breach of the Reseller Agreement

69.     The Resellers incorporate and reallege the preceding paragraphs as if fully set forth herein.

70.     The Reseller Agreement is a valid, enforceable contract.

71. The Resellers have performed under the Reseller Agreement. Indeed, several of the Resellers have earned a "Gold Partner" designation from ECI, and a testimonial video of Plaintiff Algorithm's President, Mike Oswalt, is featured on the homepage of ECI's website.

72. Section 4.2(f) of the Reseller Agreement ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████." (Exs. A–D, § 4.2(f)). By ████████████████████████████████████████████████, ECI breached section 4.2(f).

73. Section 4.2(e) of the Reseller Agreement provides that ████████████ ████████████████████████████████████████████████." (Exs. C & D, § 4.2(e)). ECI breached this section when it ████████████████████████ ████████████████████.

74. Section 12.13 of the Reseller Agreement provides that ████████████ ████████████████████████████████████████████ ████████████████████████████." (Exs. C & D, § 12.13). ECI breached section 12.13 when it ████████████████████████████████.

75. The Reseller Agreement further provides that ECI must ████████████ ████████████████. (Exs. A & B, at Ex. E; Exs. C & D, at Ex. IV). By ████████ ████████████████████████████, ECI has breached the Reseller Agreement.

76.     The Resellers have been directly harmed by ECI's multiple breaches of the Reseller Agreement, including loss of business, diminishment of the value of the Reseller business, and loss of employee good will.

## COUNT TWO

### Tortious Interference

77.     The Resellers incorporate and reallege the preceding paragraphs as if fully set forth herein.

78.     The Resellers have both contractual relationships and ongoing business relationships with End Users to provide Support and Consulting related to Macola.

79.     ECI is well aware of these relationships, which it documents for its own business purposes and, until recently, has facilitated.

80.     ECI is attempting to terminate these relationships completely by fraudulently telling End Users that continuing in these relationships will result in a breach of the License Agreement.

81.     ECI's fraudulent behavior is unjustified.  The License Agreements do not prohibit third-party access to the Macola software.  In fact, they ***permit*** it under precisely the circumstances in which End Users seek the Resellers' Support and Consulting services.  ECI knows this and is attempting to fix the problem by forcing captive End Users to sign new, more restrictive license agreements that do in fact prohibit third-party access.

82.     As a result of ECI's tortious interference, the Resellers have already incurred damages including loss of business opportunities and diminishment of the value of the Resellers' businesses, and the Resellers face complete financial ruin if ECI's unlawful interference continues to sow uncertainty and fear.  Moreover, ECI's tortious interference is causing the Resellers a loss of customer good will by suggesting that the Resellers are prohibited business

16

partners. End Users represent a substantial proportion of the Resellers' customers, and it is impossible to know the extent of the damages that ECI's conduct will cause.

## COUNT THREE

### Unfair Competition

83.    The Resellers incorporate and reallege the preceding paragraphs as if fully set forth herein.

84.    Unfair competition "extend[s]  to the circulation of false rumors, or publication of statements, all designed to harm the business of another."  *Ancestry.com Operations, Inc. v. DNA Diagnostics Ctr., Inc.*, 2016 U.S. Dist. Lexis 97297, at *12 (S.D. Ohio July 26, 2016) (quoting *Molten Metal Equip. v. Metaullics Sys., Co.*, 2000 Ohio App. Lexis 2538, at *15 (Ohio Ct. App. June 8, 2000)).

85.    In falsely telling End Users that the Resellers are prohibited from accessing the End Users' Macola systems, with the intention of hurting the Resellers' business, ECI has engaged in unfair competition.

86.    ECI's misrepresentations have caused the Resellers to lose business opportunities and threaten the loss of unknown future opportunities.

## COUNT FOUR

### Antitrust Tying

87.    The Resellers incorporate and reallege the preceding paragraphs as if fully set forth herein.

88.    Section 1 of the Sherman Antitrust Act and Chapter 1331 of the Ohio Revised Code prohibit tying arrangements.  "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'"  *Eastman Kodak Co.*

*v. Image Tech. Servs.*, 504 U.S. 451, 461-62 (1992) (quoting *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5-6 (1958)).

89.     Tying arrangements must involve at least two distinct products or services. *Id.* at 462. For example, "[f]or service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts." *Id.* Here, Maintenance is a distinct product from Support because the Resellers have historically provided Support without also providing Maintenance.

90.     The relevant market for antitrust tying analysis is the U.S. market for Macola Maintenance, which includes software updates, patches, bug fixes, and other error corrections.

91.     ECI has unrivaled market power in the U.S. Maintenance market because ECI is the sole source of Maintenance.

92.     ECI is using its market power over Maintenance to force End Users to purchase Support. ECI has confirmed that even End Users who ***do not want*** Support service will nevertheless have to pay for such service if they wish to continue to receive Maintenance.

93.     ECI's tying arrangement effectively doubles the cost of Maintenance.

94.     This tying arrangement did not exist when End Users chose to purchase Macola in the first instance; Support was an optional service. Accordingly, End Users could not have taken the tying arrangement into account when initially calculating the full lifecycle cost of Macola.

95.     End Users face high switching costs that make converting from Macola to a different ERP system prohibitive. Moreover, these switching costs greatly outweigh the increased aftermarket costs ECI is imposing on End Users through its tying arrangement. Thus, to escape ECI's monopoly pricing in the Macola aftermarket by switching to a competitive ERP

18

system, End Users would have to make the economically irrational decision to incur greater switching costs than the switch would offset through elimination of the monopoly pricing.

96.     ECI's change in policy to adopt the tying arrangement is being applied to these locked-in End Users.

97.     As a result of ECI's antitrust violation, the Resellers—along with everyone else—are prohibited from competing with ECI for Support.

98.     Most End Users purchase Maintenance.

99.     Support revenues make up a significant proportion of the Resellers' gross revenues.

100.    ECI's tying arrangement prevents a substantial volume of commerce in the market for Support.

## COUNT FIVE

### Antitrust Attempted Monopolization

101.    The Resellers incorporate and reallege the preceding paragraphs as if fully set forth herein.

102.    Section 2 of the Sherman Antitrust Act and Chapter 1331 of the Ohio Revised Code prohibit attempts to monopolize any part of commerce. Attempted monopolization occurs where a defendant's "predatory or anticompetitive conduct," committed with "a specific intent to monopolize," results in "a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993).

103.    The relevant markets for attempted monopolization analysis are the U.S. markets for Macola Support and Consulting.

104.    ECI's stated goal is to be the sole supplier of Support and Consulting and to exclude any third party from competing with it in these markets.

105.    To achieve this goal, ECI is making fraudulent misrepresentations to End Users about the provisions of their current License Agreement, attempting to intimidate the Resellers into avoiding competition, and pressuring End Users to sign new, more-restrictive license agreements to exclude competition in the markets for Support and Consulting.

106.    Given ECI's persistent threats and its power over captive End Users, ECI's scheme to monopolize the Support and Consulting markets is dangerously likely to succeed.

107.    Should ECI's attempt succeed, the End Users would be left without competitive options in the Support and Consulting markets.  ECI has already proven through its tying arrangement that it is likely to abuse this monopoly power to extract above-market prices from captive End Users in the Support and Consulting markets.

108.    The Resellers will lose substantial revenue if they are excluded from competing in the markets for Support and Consulting.

## COUNT SIX

### Declaratory Judgment

109.    The Resellers incorporate and reallege the preceding paragraphs as if fully set forth herein.

110.    ECI has informed the Resellers that (1) it intends to stop paying them margin back commissions on current Maintenance contracts after the date of termination of the Reseller Agreement; (2) it will consider the Resellers to be in breach of the Reseller Agreement if they continue to do business with End Users after termination; and (3) it intends to take over all Support and Consulting for End Users who have long done business with the Resellers and whose Macola systems in many cases rely on Reseller Technology.  A real and justiciable controversy therefore exists over the meaning of the Reseller Agreement.

111.    The Reseller Agreement obligates ECI to ███████████████████████

████████████████████████████████████████████████████████████████████████.

(Exs. A–D, § 5.1; *see also* Exs. A & B, at Ex. C; Exs. C & D, at Ex. III).  Nothing in the Reseller

Agreement excuses ECI from that continuing obligation after termination.

112.    Moreover, the Resellers are free under the Reseller Agreement to continue to

provide Support and Consulting to End Users after the date of termination.  Nothing in the

Reseller Agreement prohibits such activity.  Indeed, as to Consulting, the Reseller Agreement

explicitly acknowledges that ECI ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████”  (Exs. C & D, § 5.2 (emphases added); *see also* Exs. A & B, § 5.2).

113.    Finally, the Reseller Agreement provides that ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████.”  (Exs.

A–D, § 3.4).  Reseller Technology will remain valuable to the Resellers after termination of the

Reseller Agreement as it can be reused or repurposed for other clients.  Section 3.4 survives

termination of the Reseller Agreement, and ECI's plan to take over all Support and Consulting

for the End Users' Macola systems would necessarily breach this provision.

114.    ECI's threatened actions under the Reseller Agreement jeopardize the Resellers'

very existence, as the Resellers would immediately lose the vast majority of their income and

business relationships if ECI makes good on its threats.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Resellers respectfully request a jury trial and a judgment against

ECI in excess of $75,000 per Reseller as follows:

a. With respect to Count One, an order finding that ECI breached its contracts with the Resellers and awarding the Resellers actual and consequential damages, costs, attorneys' fees, expenses, prejudgment interest, and post-judgment interest;

b. With respect to Count Two, an order finding that ECI tortiously interfered with the Resellers' contractual and ongoing business relationships and awarding the Resellers actual, consequential, and punitive damages, costs, attorneys' fees, expenses, prejudgment interest, and post-judgment interest;

c. With respect to Count Three, an order finding that ECI unfairly competed with the Resellers and awarding the Resellers actual, consequential, and punitive damages, costs, attorneys' fees, expenses, prejudgment interest, and post-judgment interest;

d. With respect to Count Four, an order finding that ECI has imposed a tying arrangement in violation of federal antitrust laws and Chapter 1331 of the Ohio Revised Code and awarding the Resellers treble actual, consequential, and punitive damages, costs, attorneys' fees, expenses, prejudgment interest, and post-judgment interest;

e. With respect to Count Five, an order finding that ECI is attempting monopolization in violation of federal antitrust laws and Chapter 1331 of the Ohio Revised Code and awarding the Resellers treble actual, consequential, and punitive damages, costs, attorneys' fees, expenses, prejudgment interest, and post-judgment interest;

f. With respect to Count Six, an order finding that the Reseller Agreement (1) permits the Resellers to continue to provide Support and Consulting to End Users, (2) obligates ECI to continue making margin back commission payments to the Resellers on Maintenance; and (3) prohibits ECI from using, adopting, or otherwise incorporating Reseller Technology;

g. A temporary restraining order and preliminary and permanent injunctions, enjoining ECI (1) to continue margin back commission payments to the Resellers under the Reseller Agreement, (2) to refrain from further fraudulent misrepresentations that the Resellers and End Users may not do business together, (3) to stop imposing its unlawful tying arrangement on End Users, (4) to stop its attempts to monopolize the Support and Consulting markets, and (5) to refrain from further ███████████████████████████████████; and

h. An order awarding all other relief as shall be deemed appropriate in the circumstances.

Dated: November 7, 2018                          Respectfully submitted,

                                                  /s/ Shawn J. Organ
                                                 Shawn J. Organ (0042052)
                                                    *Trial Attorney*
                                                 David J. Twombly (0092558)
                                                 Sean M. Stiff (0091811)
                                                 **Organ Cole llp**
                                                 1330 Dublin Road
                                                 Columbus, Ohio  43215
                                                 614.481.0900
                                                 614.481.0904 (f)
                                                 sjorgan@organcole.com
                                                 djtwombly@organcole.com
                                                 smstiff@organcole.com

                                                 *Attorneys for Plaintiffs Resellers*

## JURY DEMAND

Plaintiffs demand a jury on all triable issues.

 /s/ Shawn J. Organ
Shawn J. Organ

## **VERIFICATION**

I, Michael Oswalt, declare as follows:

1. I am the owner of Algorithm, Inc.

2. I have personal knowledge of Algorithm, Inc. and Defendant ECI and their activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3. I swear under penalty of perjury of the laws of the United States that the factual statements set forth in this Verified Complaint are true and correct to the best of my knowledge.

_____
Michael Oswalt
Algorithm, Inc.

_____
11-6-18
Date

## <u>VERIFICATION</u>

I, Leonard Reo, declare as follows:

1. I am an owner of Attivo Group, LLC.

2. I have personal knowledge of Attivo Group, LLC and its activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3. I swear under penalty of perjury of the laws of the United States that the factual statements related to Attivo Group, LLC set forth in this Verified Complaint are true and correct to the best of my knowledge.

*Leonard A. Reo*

Leonard Reo
Attivo Group, LLC


November 6, 2018

Date

## **VERIFICATION**

I, Patrick Reiser, declare as follows:

1. I am an owner of Business Computer Technologies, Inc.

2. I have personal knowledge of Business Computer Technologies, Inc. and its activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3. I swear under penalty of perjury of the laws of the United States that the factual statements related to Business Computer Technologies, Inc. set forth in this Verified Complaint are true and correct to the best of my knowledge.

Patrick Reiser
Business Computer Technologies, Inc.

11/6/2018

Date

27

## VERIFICATION

I, Charles Wise, declare as follows:

1. I am the owner of Copious Solutions, LLC.

2. I have personal knowledge of Copious Solutions, LLC and its activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3. I swear under penalty of perjury of the laws of the United States that the factual statements related to Copious Solutions, LLC set forth in this Verified Complaint are true and correct to the best of my knowledge.

_Charles Wise_

Charles Wise
Copious Solutions, LLC

_Nov. 6, 2018_

Date

## VERIFICATION

I, Lars Johnson, declare as follows:

1. I am an owner of DataSpring, Inc.

2. I have personal knowledge of DataSpring, Inc. and its activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3. I swear under penalty of perjury of the laws of the United States that the factual statements related to DataSpring, Inc. set forth in this Verified Complaint are true and correct to the best of my knowledge.

Lars Johnson
DataSpring, Inc.

11 /7/2018

Date

29

## **VERIFICATION**

I, Tod Replogle, declare as follows:

1. I am the owner of Exceptional Software Solutions LLC.

2. I have personal knowledge of Exceptional Software Solutions LLC and its activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3. I swear under penalty of perjury of the laws of the United States that the factual statements related to Exceptional Software Solutions LLC set forth in this Verified Complaint are true and correct to the best of my knowledge.

Tod Replogle
Exceptional Software Solutions LLC

11-7-2018

Date

## VERIFICATION

I, Bart Fannin, declare as follows:

1. I am an owner of Fannin Consulting, Inc.

2. I have personal knowledge of Fannin Consulting, Inc. and its activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3. I swear under penalty of perjury of the laws of the United States that the factual statements related to Fannin Consulting, Inc. set forth in this Verified Complaint are true and correct to the best of my knowledge.

Bart Fannin

Bart Fannin
Fannin Consulting, Inc.

11/7/18

Date

31

## VERIFICATION

I, Jeffrey DeSchon, declare as follows:

1. I am a co-owner and Vice President and Secretary of the Board of Directors of iPro, Inc.

2. I have personal knowledge of iPro, Inc. and its activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3. I swear under penalty of perjury of the laws of the United States that the factual statements related to iPro, Inc. set forth in this Verified Complaint are true and correct to the best of my knowledge.

Jeffrey DeSchon
iPro, Inc.

11/6/2018

Date

## VERIFICATION

I, **Jeffrey D. Mayer**, declare as follows:

1. I am an owner of Mayer, Shanzer & Mayer, P.C.

2. I have personal knowledge of Mayer, Shanzer & Mayer, P.C. and its activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3. I swear under penalty of perjury of the laws of the United States that the factual statements related to Mayer, Shanzer & Mayer, P.C. set forth in this Verified Complaint are true and correct to the best of my knowledge.

Jeffrey D. Mayer
Mayer, Shanzer & Mayer, P.C.

11 | 6 | 2018
Date

33

## **VERIFICATION**

I, Teresa T. Peterson, declare as follows:

1. I am an owner of Red Deer Ventures, Inc.

2. I have personal knowledge of Red Deer Ventures, Inc. and its activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3. I swear under penalty of perjury of the laws of the United States that the factual statements related to Red Deer Ventures, Inc. set forth in this Verified Complaint are true and correct to the best of my knowledge.

Teresa T. Peterson
Red Deer Ventures, Inc.

11-6-2018
Date

34

## **VERIFICATION**

I, Ken Miner, declare as follows:

1.  I am an owner of Software Solutions, Inc.

2.  I have personal knowledge of Software Solutions, Inc. and its activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3.  I swear under penalty of perjury of the laws of the United States that the factual statements related to Software Solutions, Inc. set forth in this Verified Complaint are true and correct to the best of my knowledge.

Ken Miner
Software Solutions, Inc.

11-6-18

Date

## **VERIFICATION**

I, Robert J. Donald, declare as follows:

1. I am an owner of The Donas Group, Inc.

2. I have personal knowledge of The Donas Group, Inc. and its activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3. I swear under penalty of perjury of the laws of the United States that the factual statements related to The Donas Group, Inc. set forth in this Verified Complaint are true and correct to the best of my knowledge.

Robert J. Donald
The Donas Group, Inc.

NOV 6, 2018

Date

## **VERIFICATION**

I, Gregg Horwitz, declare as follows:

1. I am an owner of Triangle Partners, Inc.

2. I have personal knowledge of Triangle Partners, Inc. and its activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3. I swear under penalty of perjury of the laws of the United States that the factual statements related to Triangle Partners, Inc. set forth in this Verified Complaint are true and correct to the best of my knowledge.

Gregg Horwitz
Triangle Partners, Inc.

11/6/2018

Date